UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD DEAN RIFE,

      Plaintiff,                           Civil Action No. 15-CV-11121

vs.                                 HON. BERNARD A. FRIEDMAN

CAROLYN W. COLVIN,
ACTING COMMISSIONER
OF SOCIAL SECURITY,

      Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

          This matter is presently before the Court on cross motions for summary judgment [docket entries 17 and 19]. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide these motions without a hearing. For the reasons stated below, the Court shall grant plaintiff's motion and deny defendant's motion.

          Plaintiff has brought this action under 42 U.S.C. § 405(g) to challenge defendant's denial of his application for Social Security disability insurance benefits. Under § 405(g), the issue before the Court is whether the ALJ's decision is supported by substantial evidence, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938). In making this determination, the Court does not review the record de novo, and it may not weigh the evidence or make credibility findings. If supported by substantial evidence, defendant's decision must be upheld even if substantial evidence would have supported a contrary decision and even if the Court may have decided the case differently in the first instance. *See Engebrecht v. Comm'r of Soc. Sec.*,

572 F. App'x 392, 396 (6th Cir. 2014).

This case has a protracted history.  Plaintiff filed for benefits in December 2001, claiming disability as of July 1996 (Tr. 44).  After the claim was denied initially and on reconsideration, an ALJ held a hearing in February 2005 and issued a written decision denying plaintiff's application in May 2005 (Tr. 41-50).[1]  The Appeals Council remanded for another hearing in December 2006 (Tr. 33-40).  Following the second hearing,[2] an ALJ issued another unfavorable decision in November 2007 (Tr. 643-52) and the Appeals Council denied plaintiff's request for review of that decision in February 2010 (Tr. 6-8).  After this Court granted summary judgment for defendant in February 2011 (Tr. 683-85), the Court of Appeals remanded for further proceedings in June 2012.  *See Rife v. Comm'r of Soc. Sec.*, 485 F. App'x 56 (6th Cir. 2012); Tr. 678-80.  A third ALJ hearing was held in January 2013 (Tr. 823-54) and the ALJ issued a decision denying benefits in April 2013 (Tr. 609-25).  This became defendant's final decision in February 2015 when the Appeals Council denied plaintiff's request for review (Tr. 594-98).

At the time of the most recent ALJ decision, plaintiff was 55 years old.  When his insured status expired in December 2001 (*see* Tr. 73), he was 44 years old.  Plaintiff attended school through the ninth grade and obtained his GED in 1999 (Tr. 541).  He has work experience as a builder and laborer (Tr. 101, 119).  Plaintiff claims he has been disabled since July 1996 due to back and leg pain (Tr. 70, 92).  On his claimed disability onset date, plaintiff sought emergency room

---

[1] According to the May 2005 decision, plaintiff "also filed a Title II application on September 9, 1999, that was denied on November 24, 1999.  There are no grounds to re-open that prior application and it is administratively final" (Tr. 44).

[2] The second hearing began in June 2007 (Tr. 550-60) and continued in October 2007 (Tr. 561-93) because the medical expert, Dr. Voelpel, was not available initially.

treatment for severe lower back pain following a work injury the previous May that occurred when

plaintiff lifted a heavy plank (Tr. 143-44, 230). X-rays in July 1996 showed "left paramedian L-5/S-

1 hard disc which may contact the left S-1 nerve root" (Tr. 151) and an MRI in August 1996 showed

"[d]egenerative disc disease and herniations at L5-S1 centrally and to the left and L4-5 centrally"

(Tr. 228). In July 1997 plaintiff underwent a "hemilaminotomy . . . to remove the disk at L5-S1 on

the left" (Tr. 152).

   The ALJ found plaintiff's severe impairments to be "degenerative disk disease of the

lumbar spine status post laminectomy, chronic low back pain, left shoulder disorder" (Tr. 614). The

ALJ found that despite these impairments plaintiff has the residual functional capacity ("RFC") to

perform unskilled, sedentary work with various restrictions (Tr. 615).[3] A vocational expert ("VE")

testified in response to a hypothetical question that a person of plaintiff's age, education, and work

experience, and who has this RFC and cannot lift more than ten pounds, could not perform plaintiff's

past work but could work as an inspector, assembler, or sorter (Tr. 854-55). Based on this evidence,

the ALJ concluded that plaintiff is not disabled within the meaning of the statute (Tr. 625).

   Having reviewed the voluminous administrative record and the parties' briefs, the

_____

[3] Specifically, the ALJ found that plaintiff has the RFC

> to perform sedentary work . . . except the claimant would require a sit
> or stand option at will; no climbing ladders, ropes, or scaffolds, or
> crawling, and could perform all other postural activities occasionally;
> could not bend more than 30 degrees; no overhead reaching with the
> non-dominant upper extremity and no full extension in all directions;
> no work around unprotected heights, open hazards, or machine
> operation; no work with vibrating tools; and would require simple,
> unskilled work setting.

(Tr. 615.)

Court concludes that the ALJ's decision in this matter is not supported by substantial evidence because the ALJ's RFC evaluation of plaintiff and his hypothetical question to the VE are flawed. Since the hypothetical question failed to describe plaintiff in all relevant respects, the VE's testimony cannot be used to carry defendant's burden to prove the existence of a significant number of jobs plaintiff is capable of performing. Additionally, the ALJ failed to give sufficient weight to the opinion of plaintiff's primary treating physician, Dr. Richard Hall, who has indicated repeatedly that plaintiff is unable to work due to, among other factors, his pain level, his medication side effects, and his need to lie down periodically throughout the day.

The flaw in the ALJ's RFC evaluation and in his hypothetical question to the VE is that neither included findings regarding the side effects of plaintiff's medications or his alleged need to lie down during the day. Regarding the former, during the relevant time period (i.e., from November 1999, *see* n.1, *supra*, through the date his insured status expired in December 2001) plaintiff was taking Percocet/Percodan (Oxycodone) and Diazepam (Valium) on a daily basis. *See, e.g.,* Tr. 133, 139, 171, 175, 395, 616. These medications have common side effects, including dizziness, drowsiness, and sleepiness. *See* http://www.drugs.com/sfx/[drug name]-side-effects.html. Plaintiff has indicated repeatedly that he experienced such side effects (Tr. 97 [drowsiness, lightheadedness], 109 [drowsiness], 571 [dizziness], 576 [drowsiness, dizziness], 837 [drowsiness, "incoherent" and "stumbly"]). Plaintiff's treating physician, Dr. Hall, indicated in December 2001 that plaintiff "is pr[e]cluded from normal work activities due to side effects" (Tr. 310). Dr. Hall indicated in March 2007 that plaintiff had been taking the same medications (Perdocan and Valium) for the past ten years, that they "can cause drowsiness and some mental impairment," and that plaintiff cannot work because, in addition to needing to lie down, "the pain and medications would

4

impair his concentration" (Tr. 471).

In his written decision, the ALJ noted that plaintiff was prescribed Percocet/Percodan and Valium during the relevant time period (*see, e.g.,* Tr. 616-18), but he appears to have either misunderstood or understated the daily quantities plaintiff was taking. The ALJ wrote ambiguously that plaintiff was "taking 2 pills as needed" (Tr. 616), whereas plaintiff indicated he was taking Percodan every two to three hours and Valium twice per day (Tr. 109), up to "six of each a day" (Tr. 836). Dr. Hall wrote in a March 2007 report that plaintiff had been on the same medications for ten years, namely, "Percodan, 320mg q 4-6 hours prn, and Valium, 10 mg, q 4-6 hours, prn" (Tr. 471). The ALJ swept away the medication side effects issue by stating that "[a]though the extent of limitations (i.e., the need to lie down and drowsiness) identified by Dr. Hall are not consistent with the claimant's daily activities or the record, the undersigned has nevertheless restricted the claimant to unskilled work to account for his pain and/or medication side effects" (Tr. 621).

Elsewhere in his decision the ALJ appeared to dismiss plaintiff's medication side effects on the grounds that plaintiff

> was described as fully independent in personal care activities and ... he got his GED in 2000, returned to school in August 2001, temporarily returned to work in December 2000, and was able to sustain the drive to an appointment at the University of Michigan (which took 3.5 hours) (Exhibit DC/237, 324, 358-359, 378). In fact, at all three hearings in 2005, 2007, and 2013, the claimant described significant daily activities during the period at issue in this case. For instance, he lived alone independently before and after the surgery, engaged in light housework with some assistance from his brother, prepared simple meals, played computer games, set up a craft shop at his home, walked his dog, and drove 15 miles into town to shop, bank, and attend doctor appointments (Exhibit DC/ 545, 546, 568-569 and testimony).

(Tr. 618-19.) A review of the pages cited by the ALJ reveals that this portrayal of plaintiff's

activities is both exaggerated and fails to justify the ALJ's implied finding that plaintiff could work full-time despite his medication side effects.  At Tr. 237, Dr. Jones noted in January 2000 that plaintiff "has finished his GED" and at Tr. 324 Dr. Hall noted in August 2001 that plaintiff "is going to start school."  These simple facts say nothing to discount medication side effects and they certainly do not support a finding that plaintiff can work full-time.  At Tr. 358, Dr. Hall indicated in December 2000 that plaintiff "may return to job [illegible] job with restrictions on a temporary basis to see if can tolerate driving" and Tr. 359 is a medical form, presumably from Dr. Hall's office, that says nothing about medication side effects or plaintiff's activities.  At Tr. 378, the occupational therapist did note, as the ALJ indicates, that plaintiff "was able to pace self to drive 3.5 hours to this appointment, . . ."  However, the ALJ neglected to acknowledge that this sentence continued as follows: ". . . although he arrived reporting a pain level of 10 on a 0=no pain, 10=max. pain scale at the start of the evaluation and required 22 minutes supine positioning to reduce reported pain to a starting level of 5-6."

None of the pages cited by the ALJ suggest that plaintiff was "fully independent in personal care activities."  At the other pages cited by the ALJ ("545, 546, 568-569 and testimony"), which the ALJ cited for the proposition that "the claimant described significant daily activities during the period at issue in this case," plaintiff testified to the most minimal of activities.  At Tr. 545, plaintiff testified that in 2003 he "tried to set up a small craft shop at my residence just to simply be doing something," although he did not say, and the ALJ did not ask, if this effort succeeded or what, if anything, plaintiff did with this craft shop if indeed he set one up.  At Tr. 546, plaintiff testified that "with my physical restrictions, it's . . . all I can do to walk.  I mean, I . . . don't just lay around. . . . I'm pretty motivated and the best thing I can do now is house chores.  And then

6

I complete any one facet of that. I have to do it in phases over a period of several days just to complete simple household chores." At Tr. 568-69, plaintiff testified he would "do what I could" in terms of household chores, such as "[v]ery minimal trash. I couldn't do the dishes, you know. I had very minimal dishes, two or three maybe at a time. Laundry was just a handful of just clothes." Plaintiff testified he shopped "[s]eldom"; that he walked his dog "as much as I can" and "[j]ust around the yard"; that he did not get out to see people regularly; that friends or relatives would occasionally visit him; that he had hobbies before getting injured but has none now; and that he had trouble bathing and dressing himself (Tr. 569).   No reasonable fact-finder could interpret this testimony as indicative of plaintiff being "independent in personal care activities" and engaging in "significant daily activities." Nor does this testimony support the finding that plaintiff does not experience medication side effects that would interfere with full-time work.

At his most recent hearing in January 2013, plaintiff testified similarly to his daily activities.  He indicated that during the time period in question he lived alone, that he was therefore responsible for the care of the house but his brother "would take care of all the outside things from grocery shopping to the lawn" (Tr. 834-35).  Plaintiff could wash the dishes, but "there wasn't much activity in the house, so I couldn't dirty it up very much" and "I would have friends help back [sic] and that kind of thing" (Tr. 835).  Plaintiff could make "simple meals" for himself, but only "[m]icrowavable, no full-prepared meals, I just couldn't stand that long" (Tr. 843).  Plaintiff could dress himself "most of the time," but he would "have to call my brother, and just simply get my jeans on [sic] because I couldn't do it" (Tr. 843).  Plaintiff's other activities were watching television, walking his brother's dog, "[r]arely" playing computer games ("once or twice a week for "five or 10 minutes"), walking to his brother's house "a couple hundred feet," driving 15 miles

7

into town once per month to go to the bank and for doctor appointments, and shopping "[v]ery little" (Tr. 843-48). Plaintiff testified that he did no yard work or repairs around the house and that he and his brother sometimes attended concerts in a local park (Tr. 848-49).  No reasonable fact-finder could review this evidence and conclude that plaintiff engaged in "significant" activities that are inconsistent with severe pain, medication side effects, or the need to lie down periodically throughout the day.

The Sixth Circuit has held that the ALJ must evaluate "[t]he type, dosage, effectiveness, and side effects of any medication" as part of the process of determining the extent to which symptoms impair a claimant's capacity to work.  *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) (quoting 20 C.F.R. § 416.929(c)(3)(i)-(vi)).  Further, hypothetical questions to vocational experts must account for medication side effects.  *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789-90 (6th Cir. 2009).  These rules were disregarded in this case.  The ALJ did not make findings regarding the amount (dosages) of the medications plaintiff was taking. Nor did the ALJ evaluate plaintiff's testimony or written comments concerning his medication side effects and he offered no reason for doubting plaintiff's credibility as to this issue.  Nor did the ALJ develop the record by probing further when plaintiff testified that his medications make him feel "drowsy, . . . incoherent . . . [and] stumbly" (Tr. 837).  It appears the ALJ dismissed drowsiness as a medication side effect mentioned by Dr. Hall because it, and plaintiff's need to lie down, "are not consistent with the claimant's daily activities or the record" (Tr. 621).  Yet this finding is not supported by substantial evidence because the record confirms that during the relevant time frame plaintiff was daily taking Percodet/Percodan and Valium/Diazepam in significant quantities, and his reported daily activities were so minimal (*see, e.g.,* Tr. 99, 112, 568-70, 576, 834-35, 842-50) that

no reasonable fact-finder could conclude they rule out drowsiness.

On remand, the ALJ must (1) determine the amount of Percodet/Percodan/Oxycodone and Valium/Diazepam plaintiff was taking daily during the relevant time period, (2) make findings as to the nature and extent of these medications' side effects, if any, and adjust his findings as appropriate regarding plaintiff's RFC, and (3) incorporate these findings in proper hypothetical question(s) to the VE to determine whether work exists in significant numbers that can be performed by a person such as plaintiff who experiences such medication side effects.

The ALJ's RFC evaluation of plaintiff and his hypothetical question to the VE is also flawed due to the ALJ's failure to assess plaintiff's alleged need to lie down frequently throughout the day.  Plaintiff testified that he must lie down three or four times for "anywhere from 15 to 30 minutes to an hour and a half . . . each time" to alleviate his back pain (Tr. 851; *see also* Tr. 576). When he underwent a functional capacities evaluation in June 2000, plaintiff told the occupational therapist that on a "typical day [he] will require ½ hour to 1 hour supine positioning twice a day for pain control" (Tr. 378).[4]  Dr. Hall noted in December 2001 that plaintiff "has multiple work restrictions and regular rest periods, which involve lying down" (Tr. 310).  Dr. Hall noted in February 2005 that plaintiff has had various restrictions since his injury in 1996 including that he "[n]eeds frequent rest periods with laying down prone" (Tr. 440).  In March 2007 Dr. Hall indicated that "[f]or the past ten years [plaintiff] has had chronic back pain with muscle spasm and left shoulder pain with no real improvement" and that he "would not be a reliable employee because he would need to lay down during the day to give his back and leg a rest" (Tr. 471).

---

[4] At this evaluation, which lasted 4.5 hours including the time the therapist needed to write the report, plaintiff "required two 5-10 min. supine rest breaks during evaluation and supine rest prior to leaving" (Tr. 378).

Just as with the medication side effects issue, the ALJ dismissed plaintiff's alleged need to lie down periodically throughout the day by asserting that this need and the drowsiness "identified by Dr. Hall are not consistent with the claimant's daily activities or the record" (Tr. 621). Yet, as noted above, plaintiff has described extremely limited daily activities which no reasonable fact-finder could find to be inconsistent with the need to lie down periodically throughout the day to relieve back and leg pain. Nor is "the record" inconsistent with this alleged need, as the medical records uniformly show that plaintiff experiences back and leg pain (the differences of opinion concerning not the fact but the severity and causation thereof), and the other physicians who have expressed opinions regarding plaintiff's ability to sit, stand, and walk simply have not commented on plaintiff's need, if any, to lie down during the day. In short, plaintiff's testimony and Dr. Hall's opinion regarding this particular aspect of plaintiff's back and leg pain is neither inconsistent with nor contradicted by any other evidence in this record.

On remand, the ALJ must (1) determine whether plaintiff must lie down periodically throughout the day and, if so, how often and for how long he must do so, and (2) incorporate these findings in proper hypothetical question(s) to the VE to determine whether work exists in significant numbers that can be performed by a person such as plaintiff who has this need.

On remand, the ALJ must also reevaluate Dr. Hall's opinion, expressed repeatedly, that plaintiff is unable to work (Tr. 285, 310, 373, 375, 470-72). The Court of Appeals remanded the matter in June 2012 with instructions that the ALJ identify and evaluate Dr. Hall's restrictions so that "a meaningful review of the ALJ's application of the treating-physician rule" could occur. While the ALJ did, on remand, identify and evaluate Dr. Hall's restrictions, he failed to give proper weight to Dr. Hall's opinion. As the Court of Appeals noted,

Under the treating physician rule, the ALJ must give controlling weight to a treating source's opinion if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(c)(2). If the ALJ declines to give the treating source's opinion controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). The agency's regulation mandates: "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, SSR 96–2, p, 1996 WL 374188, at *5 (July 2, 1996). We will reverse and remand "where the ALJ fails to give good reasons on the record for according less than controlling weight to treating sources." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009).

*Rife v. Comm'r of Soc. Sec.*, 485 F. App'x 56, 58 (6th Cir. 2012). The ALJ did not give good reasons for giving "no weight" (Tr. 619) to Dr. Hall's opinion that plaintiff is unable to work. Dr. Hall, who has treated plaintiff regularly since his back injury in 1996, has opined that plaintiff is unable to work because (1) he must lie down periodically throughout the day, and (2) his pain level and medication side effects impair his concentration (Tr. 471). This opinion, expressed in March 2007, cannot be dismissed on the grounds that it post-dates the expiration of plaintiff's insured status because Dr. Hall clearly indicated that plaintiff "has had all of these problems since his surgery in January of 1997 with little if any improvement" (Tr. 472). Moreover, Dr. Hall had previously expressed the same opinion in December 2001, before plaintiff's insured status expired (Tr. 310).

11

Nor can Dr. Hall's opinion be dismissed on the grounds that it is unsupported by objective findings, as Dr. Hall noted (in January 2000) "MRI testing confirming the degenerative disc disease" (Tr. 393, 442) and repeatedly observed muscle spasms in plaintiff's back and neck and decreased range of motion during the relevant period (Tr. 179, 318, 333, 343, 348, 351, 362, 368, 371, 373, 375). While the ALJ correctly notes that other physicians, such as Dr. Buszek who examined plaintiff once in May 2001 (Tr. 336-40), have opined that plaintiff could meet the *exertional* demands (i.e., the ability to sit, stand, walk, and lift) of sedentary work, no physician has expressed an opinion contradicting Dr. Hall as to plaintiff's need to lie down and his reduced ability to concentrate due to pain and medication side effects. Nor do plaintiff's minimal daily activities provide a reasonable basis for rejecting these critical aspects of Dr. Hall's opinion. In short, the record does not support the ALJ's rejection of the specific bases of Dr. Hall's opinion. On remand, the ALJ must either defer to Dr. Hall or give good reasons for finding that plaintiff, during the relevant time period, did not need to lie down periodically throughout the day and that plaintiff's concentration was not impaired to a disabling degree by his pain level and medication side effects.

For the reasons stated above, the Court concludes that the ALJ's decision in this matter is not supported by substantial evidence. Although proof of disability is strong in this case, the Court believes that remanding the matter for an award of benefits would not be appropriate at this time because the record, in its current state, is not such that "proof of disability is overwhelming or . . . proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Rather, the matter must be remanded so that the record may be further developed to correct the errors noted above. Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is denied.

IT IS FURTHER ORDERED that plaintiff's motion for remand is granted and this matter is remanded for further proceedings as specified above.  This is a sentence four remand under § 405(g).


|  |  |
|---|---|
|  | s/Bernard A. Friedman |
| Dated: December 9, 2015 | BERNARD A. FRIEDMAN |
| Detroit, Michigan | SENIOR UNITED STATES DISTRICT JUDGE |

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 9, 2015.

s/Johnetta M. Curry-Williams
In the absence of Carol Mullins
CASE MANAGER

13